## UNITED STATES DISTRICT OCURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Thomas George Michlitsch, | Case No. 17-cv-3470 (MJD/TNL) |
| Plaintiff, | |
| v. | **REPORT &** |
| | **RECOMMENDATION** |
| Nancy A. Berryhill, Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security, | |
| Defendant. | |

---

Stephanie Ann Christel, Livgard & Lloyd, PLLP, 2520 University Avenue Southeast, Suite 202, Minneapolis, MN 55414 (for Plaintiff); and

Bahram Samie, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Thomas George Michlitsch brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 11) and the Commissioner's Motion for Summary Judgment (ECF No. 13). These motions have been referred to the undersigned for a report and recommendation to the district court, the

1

Honorable Michael J. Davis, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 13) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in May 2014, asserting that he has been disabled since December 13, 2011, due to a "back injury."[1]  (Tr. 15, 93, 100, 101, 109, 168, 192, 196, 202, 210.)   Plaintiff's application for DIB was denied initially and again upon reconsideration.  (Tr. 15, 98, 100, 107, 109; *see* Tr. 114-19, 120-23.)  Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 15, 124-25; *see* Tr. 126-36.)

The ALJ held a hearing in January 2016.  (Tr. 15, 29, 31; *see* Tr. 138-65.)  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review.  (Tr. 1-5.)  Plaintiff then filed the instant action, challenging the ALJ's decision.  (Compl., ECF No. 1.)  The parties have filed cross motions for summary judgment.  (ECF Nos. 11, 13.)  This matter is fully briefed and ready for a determination on the papers.

---

[1] An earlier disability determination covered the period from March 1, 2012 through May 1, 2014.  (*See* Tr. 75-88, 94, 102, 192.)  Prior to the hearing, Plaintiff sought to amend his alleged onset date to May 1, 2014.  (Tr. 42, 236.)  The ALJ, however, considered the entire period from December 13, 2011 through December 31, 2015, the date Plaintiff was last insured.  (Tr. 15, 17, 23.)

### III. RELEVANT MEDICAL HISTORY

#### A. Prior to 2013

At the end of 2011, Plaintiff had a "sudden onset of back pain" when he fell and landed on his back after a chair he was sitting on broke. (Tr. 319; *accord* Tr. 350; *see* Tr. 320, 373.) In February 2012, Plaintiff had back surgery, a left L4 hemilaminectomy and microdiscectomy. (Tr. 262, 272, 277, 319, 320, 341; *see* Tr. 306, 310, 373, 374.)

#### B. 2013

At the end of October 2013, Plaintiff was seen by John D. Mageli, M.D., for an annual physical. (Tr. 261.) Among other complaints, Plaintiff was "concerned about lower back and left leg pain." (Tr. 261.) Plaintiff also reported that "[h]is left foot doesn't work." (Tr. 261; *see* Tr. 272.) Plaintiff had attended physical therapy intermittently, which was of "questionable help." (Tr. 261.) Plaintiff's active diagnoses included, among others, left foot drop, lumbar disc herniation with radiculopathy, chronic low back pain, and lumbar radiculopathy. (Tr. 261; *see* Tr. 272.)

Upon examination, Plaintiff's back was "straight and non-tender," and he had full range of motion in his upper and lower extremities. (Tr. 264.) His neurologic exam was normal. (Tr. 264.) Plaintiff's body mass index ("BMI")[2] was approximately 35. (Tr. 264.)

---

[2] "Body mass index (BMI) is a measure of body fat based on height and weight that applies to adult men and women." *Calculate Your Body Mass Index*, Nat'l Heart, Lung & Blood Inst., U.S. Dep't of Health & Human Servs., https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited May 18, 2018). A BMI of 30 or greater is considered obese. *Id.*

Dr. Mageli prescribed methylprednisolone,[3] a "Medrol Pak," for Plaintiff's lumbar radiculopathy and noted that a steroid injection could be arranged for Plaintiff's back if the methylprednisolone was unsuccessful.  (Tr. 265.)  Dr. Mageli noted that Plaintiff's "BMI is out of normal range" and discussed weight loss with Plaintiff.  (Tr. 265.)  Dr. Mageli noted that Plaintiff was "not ready to act" on this.  (Tr. 265.)

### C. 2014

During a follow-up appointment at the end of February 2014 for unrelated conditions, Plaintiff and Dr. Mageli discussed treatment of Plaintiff's lumbar radicular pain.  (Tr. 268.)  Dr. Mageli noted that Plaintiff wanted the steroid injection "but will probably need [a] repeat MRI."  (Tr. 268.)  Dr. Mageli prescribed another Medrol Pak.  (Tr. 269.)  Plaintiff's BMI continued to be approximately 35.  (Tr. 269.)

Approximately one month later, Plaintiff followed up with Dr. Mageli for unrelated conditions.  (Tr. 279.)  Plaintiff's BMI was around 35.  (Tr. 281.)  Plaintiff again expressed interest in the steroid injection and Dr. Mageli prescribed a SoluMEDROL[4] shot.  (Tr. 280, 282.)

Plaintiff next followed up with Dr. Mageli in May.  (Tr. 291.)  His primary concerns were again unrelated.  (Tr. 291.)  During this visit, Plaintiff reported having back pain.  (Tr. 292.)  Plaintiff also reported that he had lost 30 pounds and his BMI was

---

[3] Methylprednisolone is used to treat inflammation in the body.  *Methylprednisolone (By mouth)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011173/?report=details (last visited May 18, 2018).

[4] SoluMEDROL is a brand name for a methylprednisolone injection.  *Methylprednisolone (By injection) (SoluMEDROL)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www ncbi nlm nih.gov/pubmedhealth/ PMHT0011175/ (last visited May 18, 2018).

approximately 32.  (Tr. 292, 293.)  Dr. Mageli again prescribed a SoluMEDROL shot.  (Tr. 294.)

When Plaintiff saw Dr. Mageli in August, he requested another SoluMEDROL shot.  (Tr. 302, 303.)  Plaintiff reported continuing back pain, but the shot "help[ed] his back for [two] months."  (Tr. 303.)  Plaintiff's BMI was near 33.  (Tr. 304.)  Plaintiff was given another SoluMEDROL shot.  (Tr. 305.)

Plaintiff's next appointment with Dr. Mageli was towards the end of October.  (Tr. 306.)  Back pain was one of his chief complaints.  (Tr. 306.)  Plaintiff reported that the SoluMEDROL shot was not helpful.  (Tr. 307.)  Plaintiff's BMI was approximately 34.  (Tr. 308.)  Dr. Mageli prescribed another Medrol Pak.  (Tr. 308.)

### D.  2015

Plaintiff saw Dr. Mageli again at the end of January 2015 for back pain, among other things.  (Tr. 355.)  Plaintiff reported that his back pain was still severe, but is okay if he is lying on his side.  (Tr. 357.)  Plaintiff stated that he "[c]annot do anything."  (Tr. 357.)  Plaintiff took aspirin and antidepressants in the morning and these helped with his pain.  (Tr. 357.)  Plaintiff's BMI was approximately 35.  (Tr. 357.)  Dr. Mageli noted that Plaintiff "[n]eeds handicapped sticker for car."  (Tr. 357.)

In mid-February, Plaintiff was seen by Christopher Alcala-Marquez, M.D., for the treatment of low-back and left-leg pain.  (Tr. 341.)  Plaintiff reported that his prior back surgery was helpful for approximately six months but his symptoms have returned and worsened over the past two years.  (Tr. 341.)  Dr. Alcala-Marquez additionally noted:

Prior to surgery in 2012, [Plaintiff] did have drop foot on the left with excruciating pain. He states that his pain is not as severe as it was before surgery; however, it is bothering him significantly. Pain is predominantly localized to the low back region radiating into the left buttock down the posterior thigh and affecting the knee. He currently takes aspirin for pain management. He has tried physical therapy; however, has never had any epidural steroid injections. Over the past two years, he has had injections into the buttock area, which he states gave him good relief. However, in October 2014, he had these injections again . . . [and] they no longer helped. He has tried oral steroids in the past, which provided him with relief. However, the last time he tried steroids, he did not get significant relief. He states his pain is worse in the mornings; however, gets better as the day goes on. 70% of the pain comes from the back, 20% comes from the buttock, and 10% comes from the knee. He rates his pain at 2/10 while sitting; however, the pain increases with standing, walking, and other activities. . . . He does note some left foot weakness as he did have drop foot on the left. However, this has improved since surgery. Aggravating factors include standing and walking; while alleviating factors . . . include sitting and lying down on his right side.

(Tr. 341; *see* Tr. 319, 350.)

Upon examination, Dr. Alcala-Marquez noted:

Gait reveals normal cadence and rhythm. There is no antalgia or ataxia. He is able to toe and heel walk. Tandem gait intact. He does have some limited range of motion at the lumbar spine and has more pain with extension. Inspection of the lumbar spine reveals no deformity, asymmetry, or contour change. . . . He does not have any tenderness to palpation at midline or paraspinal muscles. Motor strength is 5/5 in all muscle groups in bilateral lower extremities. Incision is intact from L3 to S1 in bilateral lower extremities. Deep tendon reflexes are 1+ at the patellar and Achilles tendons bilaterally. No clonus noted on exam bilaterally. Negative Hoffman's bilaterally. Negative straight leg raise in sitting position bilaterally. Palpable pulses in bilateral lower extremities. Full range of motion at the hips without pain on

> internal and external rotation.   Negative Patrick's test bilaterally.

(Tr. 343.)

Dr. Alcala-Marquez diagnosed Plaintiff with "left-sided radiculopathy with pseudoclaudicatory type symptoms."  (Tr. 343; *see* Tr. 344.)   Dr. Alcala-Marquez recommended physical therapy and epidural steroid injections followed by surgery if these were unsuccessful.  (Tr. 343; *see* Tr. 319.)  Because Plaintiff's last MRI was in 2012, Dr. Alcala-Marquez ordered a new MRI "to evaluate for recurrence of disc herniation and evaluation of degree of nerve impingement if any."  (Tr. 343; *see* Tr. 317-18, 348.)  Dr. Alcala-Marquez also ordered physical therapy and noted that a left L4-L5 transforaminal epidural steroid injection would likely be ordered for Plaintiff following the new MRI.  (Tr. 343, 346.)  Additionally, Dr. Alcala-Marquez counseled Plaintiff on weight management.  (Tr. 344.)

At the end of March, Plaintiff was seen at United Pain Center for injection therapy.  (Tr. 319; *accord* Tr. 350; *see* Tr. 347.)  Plaintiff had tried physical therapy "twice with some help, but d[id] not feel further [physical therapy] would be helpful." (Tr. 319; *accord* Tr. 350.)  Plaintiff also "prefer[red] to remain conservative for surgery at this time."  (Tr. 319; *accord* Tr. 350.)  Plaintiff reported that "his back pain is most severe, followed by his buttock and leg pain."  (Tr. 319; *accord* Tr. 350.)  Standing and walking caused the most pain and Plaintiff reported that he cannot bend backward due to pain.  (Tr. 319, 350.)  Plaintiff presented with a cane.  (Tr. 320, 350)  Plaintiff rated his pain at 5 out of 10.  (Tr. 319, 320, 350.)

During the appointment, the results of the MRI taken approximately one month earlier were discussed:

> 1. At L3-L4 there is severe central canal stenosis secondary to a diffuse broad-based disc bulge extending into the inferior foraminal zones bilaterally where there is mild bilateral neural foraminal narrowing. 2. At L4-L5 there is severe central canal stenosis secondary to a diffuse asymmetric left disc bulge with advanced facet arthropathy and ligamentum flavum thickening. There is moderate left foraminal stenosis. 3. At L2-L3 there is mild central canal stenosis secondary to an asymmetric left annular bulge. 4. The spinal canal is narrow on a congenital basis in the lower lumbar spine due to short pedicles. 5. Small Schmorl's nodes at the superior endplate of L5 with associated edema extending into the right L5 pedicle.

(Tr. 320; *accord* Tr. 350; *see* Tr. 317-18, 352-53.)

Plaintiff was diagnosed with "significant disc degeneration, arthritis, and stenosis" and "slight SI joint dysfunction." (Tr. 320; *accord* Tr. 351.) Plaintiff was given a transforaminal lumbar epidural steroid injection at L4-L5 on the left. (Tr. 320-21, 351.) Plaintiff reported an immediate decrease in pain from 5 to 3 out of 10. (Tr. 321, 351; *see* Tr. 323.) Plaintiff was directed to follow up with Dr. Alcala-Marquez. (Tr. 320, 351.)

Plaintiff followed up with Dr. Alcala-Marquez approximately one week later. (Tr. 337-40.) Plaintiff's motor strength was "5/5 through all muscle groups in the lower extremities"; his sensation was "intact upon light touch bilaterally in the lower extremities"; and his deep tendon reflexes were "+1 bilaterally in the lower extremities." (Tr. 338.) Plaintiff had negative straight leg raising bilaterally and "negative Babinski."

8

(Tr. 338.)  There was "no evidence of clonus."  (Tr. 338.)  Plaintiff had full bilateral range of motion in his hips, knees, and ankles.  (Tr. 338.)

Dr. Alcala-Marquez reviewed Plaintiff's treatment options with him.  (Tr. 338.) Plaintiff felt that he had not exhausted his non-surgical options and wanted to proceed with physical therapy and "occasional epidural steroid injections."  (Tr. 338.)  Dr. Alcala-Marquez noted that "this is very appropriate and reasonable."  (Tr. 338.)  Dr. Alcala-Marquez advised Plaintiff "that this is a quality of life issue and he can select to have surgery, if his symptoms worsen or if he develop[s] any neurological deficits."  (Tr. 338.) Plaintiff was directed to contact Dr. Alcala-Marquez if his symptoms worsened.  (Tr. 338.)

From May through the middle of August, Plaintiff participated in a rehabilitation program with Minnesota Spine Rehab.  (Tr. 365-75.)  At the initial assessment, Plaintiff's chief complaints were lower back pain "associated with left lower extremity pain, numbness and tingling traveling below the knee."  (Tr. 373.)  Plaintiff's "back symptoms [we]re more significant than his extremity symptoms."  (Tr. 373.)  Plaintiff reported "constant lower back pain," which intensified at night.  (Tr. 373.)  Plaintiff rated his pain at 5 to 6 out of 10.  (Tr. 373.)  Changes in position helped relieve his pain and physical activity tended to increase it.  (Tr. 373.)

Plaintiff reported "progressive worsening of his lower back pain" over "the last few years."  (Tr. 373.)  Plaintiff had "been treated conservatively for his complaints with medications, physical therapy and home exercises with marginal improvement in his

symptoms." (Tr. 373.) Plaintiff experienced "some marginal improvement" with the epidural steroid injection. (Tr. 373.)

Plaintiff was assessed by Sherief A. Mikhail, M.D., M.P.H. (Tr. 375.) Plaintiff was positive for central spinal stenosis and peripheral nervous symptoms as well as chronic lower back pain. (Tr. 374.) Upon examination, there was no spasm, tenderness, or deformity in Plaintiff's neck and he had "[f]ull range of motion without discomfort." (Tr. 375.) Plaintiff's "[p]eripheral pulses [we]re 2+ and symmetric in the upper and lower extremities." (Tr. 375.) Dr. Mikhail additionally noted:

> Examination of the back in the standing position shows a normal lumbar lordosis. . . . There is involuntary muscle tightness and point tenderness noted in the lumbosacral region. There is no triggering noted on examination. There is no tenderness on percussion of the spine.
>
> Straight leg lift is negative bilaterally. Lower limb reflexes are present and symmetric. [Plaintiff] is able to get up on his toes without difficulty. [Plaintiff] is unable to get up on his heel because of left ankle weakness. Dorsiflexor strength on the left is estimated as 3/5. The remainder of the lower extremity strength testing is normal by opposition. Sensation and perfusion are intact. The patient ambulates with a slightly limping gait. Waddell signs are negative. Trunk shows essentially normal range of motion. There is moderate discomfort noted on flexion and extension.

(Tr. 375.)

Dr. Mikhail diagnosed Plaintiff with spinal stenosis, lumbar radiculopathy, deconditioning syndrome, and left foot drop. (Tr. 372.) Dr. Mikhail described Plaintiff's prognosis for improvement as "good." (Tr. 372.) Dr. Mikhail directed Plaintiff to

continue taking Anacin[5] and prescribed gabapentin[6] for Plaintiff's "neuropathic complaints and chronic discomfort." (Tr. 372.) Plaintiff could also supplement with extra-strength Tylenol for additional pain relief. (Tr. 372.)

Dr. Mikhail saw Plaintiff an additional four times during the rehabilitation program, approximately every three to four weeks. (Tr. 365-71.) Each time, Plaintiff reported some improvement in his pain. (Tr. 365, 367, 369, 371.) Over the course of the program, Plaintiff's pain went from being "somewhat constant" at a 4 out of 10 to being "intermittent" at a 2 to 3 out of 10. (Tr. 367, 371.) Plaintiff also went from "lifting 25 foot pounds for 30 repetitions until full fatigue of the lumbar extensors" to "lifting 135 foot pounds for 12 repetitions until full fatigue of the lumbar extensors." (Tr. 365, 371.) Although Plaintiff continued to report lower left extremity weakness and pain radiating into his buttocks throughout the program, he also reported an increase in strength and flexibility. (Tr. 365, 367, 369, 371.) During the course of the program, Dr. Mikhail changed Plaintiff's medication from gabapentin to Topamax[7] due to grogginess and then again from Topamax to Lyrica[8] due to an allergic reaction. (Tr. 367, 369.) None of these medications were effective for Plaintiff. (Tr. 365.) Dr. Mikhail encouraged Plaintiff to remain active. (Tr. 366, 368, 369, 371.)

---

[5] Anacin is a brand name for acetaminophen, a pain reliever. *Acetaminophen*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a681004.html (last visited May 18, 2018).

[6] Gabapentin is also used to treat pain among other things. *Gabapentin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a694007.html (last visited May 18, 2018).

[7] Topamax is a brand name for topiramate, which is generally used to treat certain types of seizures and in the prevention of migraine headaches. *Topiramate (By mouth) (Topamax)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012471/ (last visited May 18, 2018).

[8] Lyrica is a brand name for pregabalin, a medication used to treat nerve and muscle pain. *Pregabalin (By mouth) (Lyrica)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011830/ (last visited May 18, 2018).

In August, Plaintiff was discharged from the rehabilitation program to a home program after he "reached a dynamic plateau an optimal level of function." (Tr. 365.) Dr. Mikhail discussed "the importance of maintaining a home program" as "this was a lifelong function." (Tr. 365.) Plaintiff was directed to continue managing his pain with Anacin. (Tr. 365.)

When Plaintiff saw Dr. Mageli towards the end of September, he reported that his back was generally "much better – with therapy and exercise." (Tr. 362.) Dr. Mageli prescribed another Medrol Pak for Plaintiff. (Tr. 364.)

## IV. OPINIONS OF DR. MAGELI

### A. February 2014

In February 2014, Dr. Mageli completed a Physical Residual Functional Capacity Questionnaire regarding Plaintiff. (Tr. 252-54.) Dr. Mageli reported that he sees Plaintiff "every 3-6 months." (Tr. 252.) Dr. Mageli listed Plaintiff's diagnoses as "lumbar radiculopathy s/p surgery" and described his prognosis as "poor to fair." (Tr. 252.) Plaintiff's symptoms were "chronic back [and] leg pain" as well as "leg weakness." (Tr. 252.) Plaintiff experienced "[m]oderately severe" pain on a "daily" basis. (Tr. 252.) When asked to identify the relevant clinical signs and objective findings, Dr. Mageli wrote "[i]mpaired sleep" and "weakness in legs." (Tr. 252.) In describing Plaintiff's treatment, Dr. Mageli reported that Plaintiff had undergone surgery and was "initially better than worse over [the] last year." (Tr. 252.) Plaintiff had also participated in physical therapy. (Tr. 252.)

12

The questionnaire then asked a series of questions about the effects of Plaintiff's impairments during a typical workday. (Tr. 252-53.) Dr. Mageli checked "[f]requently" when asked how often Plaintiff's pain and symptoms were "severe enough to interfere with [the] attention and concentration needed to perform even simple work tasks." (Tr. 253.) Dr. Mageli checked "yes" when asked if Plaintiff needed a job where he could "shift[] positions *at will* from sitting, standing or walking." (Tr. 253.) Dr. Mageli opined that Plaintiff could sit for about two hours total and "stand/walk" for about two hours total in an eight-hour work day. (Tr. 253.) Dr. Mageli did not answer the questions asking how long Plaintiff could sit or stand at one time before needing to change positions. Dr. Mageli additionally opined that Plaintiff could occasionally lift and carry up to 20 pounds, but never 50 pounds. (Tr. 253.) Dr. Mageli further opined that Plaintiff "need[ed] to use a cane for ambulation when outside his home." (Tr. 254.)

Lastly, Dr. Mageli opined that Plaintiff's impairments were "likely to produce 'good days' and 'bad days'" and Plaintiff would likely be absent more than four days per month as a result of his impairments. (Tr. 253.)

### B. April 2015

In April 2015, Dr. Mageli completed another Physical Residual Functional Capacity Questionnaire regarding Plaintiff. (Tr. 313-15.) Dr. Mageli listed Plaintiff's diagnoses as "[c]hronic neuropathic pain" and described his prognosis as "poor." (Tr. 313.) Dr. Mageli reported that Plaintiff's pain "[r]adiates from the lumbar region." (Tr. 313.) When asked to identify the associated clinical findings and objective signs, Dr.

13

Mageli indicated "muscle spasm" and "impaired sleep." (Tr. 313.) Dr. Mageli noted that surgery had been unsuccessful. (Tr. 313.)

Dr. Mageli again checked "[f]requently" when asked how often Plaintiff's pain and symptoms were "severe enough to interfere with [the] attention and concentration needed to perform even simple work tasks." (Tr. 313.) Dr. Mageli also again opined that Plaintiff needed a job where he could "shift[] positions *at will* from sitting, standing or walking." (Tr. 314.) This time, Dr. Mageli opined that Plaintiff could sit and stand for 30 minutes each before needing to change positions. (Tr. 314.) Dr. Mageli also reduced the total time Plaintiff was able to sit and "stand/walk" in an eight-hour work day to less than two hours each. (Tr. 314.) In addition, Dr. Mageli opined that Plaintiff needed to walk around approximately every 30 minutes during the day for 15 minutes. (Tr. 314.)

Like the prior questionnaire, Dr. Mageli reported that Plaintiff needed to use a cane or other assistive device while standing or walking. (Tr. 315.) This time, Dr. Mageli also reduced the weight Plaintiff was able to lift and/or carry, opining that Plaintiff should never lift and/or carry even less than ten pounds. (Tr. 315.)

Dr. Mageli again reported that Plaintiff would have good and bad days and be absent more than four days per month. (Tr. 315.) When asked if Plaintiff would need to take unscheduled breaks, Dr. Mageli wrote that Plaintiff "[r]eally cannot work" on account of his pain. (Tr. 314.) Dr. Mageli indicated that Plaintiff's "impairments [were] *reasonably consistent* with the symptoms and functional limitations described" in the questionnaire. (Tr. 313.)

14

## V. DISABILITY REPORTS & DETERMINATIONS

### A. Prior to Initial Determination

The record does not contain the typical functional report generally completed with DIB applications, which asks a claimant questions about how his or her impairments limit the ability to work, the claimant's typical day, the effect his or her impairments have on a variety of activities, and the effect, if any, the claimant's impairments have on certain abilities. *See* Forms, Soc. Security Admin, https://www.ssa.gov/forms/ (last visited May 18, 2018) (follow "Function Report – Adult" hyperlink for Form SSA-3373-BK).

### B. Initial Determination

As stated above, Plaintiff's application for DIB was denied initially. (Tr. 15, 98, 100.) Plaintiff was determined to have the severe impairment of a spine disorder, which did not meet or equal a listed impairment. (Tr. 96.) Gregory H. Salmi, M.D., assessed Plaintiff's residual functional capacity. (Tr. 96.) Dr. Salmi opined that Plaintiff had the following exertional limitations: he could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; was otherwise unlimited in his ability to push and/or pull; stand and/or walk for approximately six hours in an eight-hour workday; and sit for approximately six hours in an eight-hour workday. (Tr. 97.) Dr. Salmi identified no other limitations, including postural, manipulative, visual, communicative, or environmental. (Tr. 97.) Dr. Salmi noted that Plaintiff's back pain "[a]ppear[ed] controlled on medications" and the residual functional capacity reflected Plaintiff's allegations of pain. (Tr. 97.) Plaintiff was determined to be capable of performing his past relevant work, and therefore not disabled.

### C. Following the Initial Determination

Following the initial determination, Plaintiff completed a disability report. (Tr. 204-08.) Plaintiff reported that his "pain is getting worse" and he is "even more limited in what [he] can do during the day." (Tr. 204.) Plaintiff described the change as "gradual." (Tr. 204.) When asked about how his impairments affect his ability to care for his personal needs, Plaintiff reported that "[e]verything is a process." (Tr. 207.) He needs to do things "much slower that [he] used to" and is unable to do anything that requires bending down. (Tr. 207.) Plaintiff reported that he "cannot make any meals anymore" and prepares "simple microwave and stove top stuff that doesn't require much standing." (Tr. 207.)

When asked about changes in his daily activities, Plaintiff reported that he can "no longer go to SNAP Fitness to do [his] at-home therapy exercises that [his physical therapist] told [him] to do." (Tr. 207.) Plaintiff stated that he "cannot handle it anymore" and "[e]ven the simple exercises/stretches are too painful." (Tr. 207.) Plaintiff reported that he needs to use a cane for any extended standing and walking when away from home and, afterwards, he is "in a lot of pain." (Tr. 207.)

### D. Reconsideration Determinations

On reconsideration, Plaintiff was again determined to have the severe impairment of a spine disorder, which did not meet or equal a listed impairment. (Tr. 104-05.) Paul Ossmann, M.D., affirmed Dr. Salmi's residual-functional-capacity assessment. (Tr. 105-06.) Plaintiff was again determined to be capable of performing his past relevant work, and the prior determination was affirmed. (Tr. 105-07, 109.)

### E. Following the Reconsideration Determination

After his DIB application was denied again on reconsideration, Plaintiff completed another disability report.  (Tr. 212-17.)  Plaintiff answered "yes" when asked if there had been any change (for better or worse) in his conditions since his last disability report.  (Tr. 212.)  Plaintiff reported that he is "pretty much horizontal all day, every day laying [sic] and/or elevating [his] legs."  (Tr. 212; *see* Tr. 216.)  Plaintiff stated that this "is the only way [he] feel[s] comfortable."  (Tr. 212.)  Plaintiff reported that his impairments make it "[h]ard to dress" and "take care of [his] personal needs."  (Tr. 216.)  Plaintiff also reported that he is not able to cook, "just [prepare] simple meals."  (Tr. 216.)

## VI. ALJ PROCEEDINGS & DECISION

### A. Hearing Testimony

#### 1. Plaintiff

At the hearing before the ALJ, Plaintiff testified that he used to working in the printing industry as an account manager.  (Tr. 33-34; *see* 197.)  Plaintiff's position required "a lot of running around all at once."  (Tr. 34; *see* Tr. 33.)  Plaintiff also helped carry, pack, and inspect things.  (Tr. 34.)  In addition, Plaintiff "did a lot of mockups for TV commercials."  (Tr. 33.)

Plaintiff testified that he lived in a bungalow, where everything but the laundry was on one level.  (Tr. 34.)  Plaintiff also has a little dog.  (Tr. 32, 41.)  When asked about a typical day, Plaintiff testified that he usually listens to the radio in bed for a while before getting up then tends to his personal care, makes coffee, and gets dressed.  (Tr. 35.)  Plaintiff testified that he performs his own cooking and cleaning, but it "tak[es] so

much longer to get anything done." (Tr. 35.) Plaintiff testified that it takes him one and one-half hours to make lunch because he needs to go lay down, sit down, or lean on the counter. (Tr. 35.) Plaintiff also testified that he has had to let many things go in terms of tidying up around his home. (Tr. 36.) Plaintiff testified that he spent approximately one-third of his day lying down. (Tr. 37.) Two days per week, Plaintiff spent most of the day in bed. (Tr. 38.) Plaintiff also had good and bad days. (Tr. 38.) In his free time, Plaintiff enjoyed reading and drawing. (Tr. 41.)

Plaintiff testified that problems with his back, pain, and lack of flexibility impaired his ability to work. (Tr. 31-32; *see* Tr. 40.) Plaintiff testified that he "wear[s] out after 10, 15 minutes of . . . a position, or standing, or walking." (Tr. 32.) Plaintiff testified that he could stand for about 10 minutes unsupported. (Tr. 32.) Plaintiff was able to go "another 15, 20 minutes" if he was able to lean on something. (Tr. 32.) Plaintiff testified that he could walk approximately one and one-half blocks. (Tr. 32.)

As for his ability to sit, Plaintiff testified that it depended upon the type of chair. (Tr. 33.) Plaintiff testified that he is able to sit for approximately 20 to 30 minutes "in a straight-backed chair," such as "a regular office chair" or "a card table chair." (Tr. 33.) It was more difficult for Plaintiff to sit in "soft" chairs, requiring him to reposition for his back. (Tr. 33.) As an example, Plaintiff testified that "going to a movie is really difficult" and he has "to get up . . . at least a couple times just to reposition [his] back." (Tr. 33.)

When asked why he was unable to do his previous work, Plaintiff testified that all of the moving around would be difficult. (*See* Tr. 33-34, 40.) Plaintiff also testified that

he could not sit for that long and would need to reposition. (Tr. 36.) Plaintiff testified that he would not "be able to lay down on the floor at work for 15 minutes like [he] do[es] at home" or lay on the floor and talk to people on the phone like he does at home. (Tr. 36.) Plaintiff also testified that pain makes it difficult for him to concentrate. (Tr. 36; *see* Tr. 40.) Plaintiff was able to read for 15 to 20 minutes before losing his concentration and needing to reposition due to back pain. (Tr. 37.)

Plaintiff also testified that he experiences pain in his knee because of "the pinched nerve in [his] back or the nerve damage." (Tr. 38.) Plaintiff testified that, "10 times a day," he experiences sharp pain, "like a bullet or a knife." (Tr. 38.) Plaintiff also has difficulties due to his drop foot, where he will catch his foot on the floor and fall forward. (Tr. 39.) Plaintiff testified that, when he walks his dog, his neighbors can "hear [him] coming[] because it's step, clump, step, clump." (Tr. 39.)

Plaintiff testified that his "[c]ane helps a whole lot" for the drop foot, and also helps in general with walking and balance. (Tr. 39.) Plaintiff testified that he "wouldn't think of going to a mall, or a zoo, or something, without using the cane . . . the whole time." (Tr. 40.) Plaintiff described it as a "balance thing." (Tr. 40.) Plaintiff testified that, when his back gets tired, his "balance just goes" and then his "left side goes." (Tr. 40.) Plaintiff testified that he does not use his cane around the house very often because he is "not going that far." (Tr. 39.) When Plaintiff goes out, however, he takes his cane with him, "knowing that after a block, [he is] going to have to sit down or stop somebody." (Tr. 39.) As an example, Plaintiff testified that he takes a friend of his to a

hospital in Rochester, Minnesota, once per month and, "if [he] forget[s] [his] cane, [he's] like, wait up for me. I've got to sit down here a while." (Tr. 39-40.)

Plaintiff testified that he takes between eight to ten aspirin per day for pain. (Tr. 40.) Plaintiff testified that he tried other medications, but they were either ineffective (gabapentin) or caused an allergic reaction (Topamax and another medication for treating "nerve pain"). (Tr. 40-41.) Plaintiff testified that he does not receive help from anyone on a daily basis, but his neighbors will assist with shoveling his sidewalk and moving things. (Tr. 41-42.) A friend of Plaintiff's also helped organize his kitchen and closets so that he did not have to reach or use a stool to get things. (Tr. 42.)

### 2. Dr. Frazin

Jared A. Frazin, M.D., testified as the medical expert. (Tr. 15, 31, 42-45.) Dr. Frazin identified a number of physical impairments based on the medical records, including "low-back pain due to lumbar degenerative disc disease and radiculopathy, with residual left-foot drop"; "a history of left L4-5 microdiscectomy"; "SI joint dysfunction"; and "obesity." (Tr. 43.) Dr. Frazin noted normal examination findings with "some decreased range of motion of the back." (Tr. 43.) Dr. Frazin testified that Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 45.)

Dr. Frazin testified that Plaintiff

> fit into the general category of sedentary, sitting—lifting 10 pounds occasionally, less than 10 pounds frequently; stand or walk two hours and sit six hours out of an eight-hour day, with the ability to change position every hour. And then to limit the use of the lower extremities for foot controls to occasional. And then, occasional for all of the postural limitations of climbing, balancing, stooping, kneeling,

crouching, and crawling.   And then, no manipulative limitations with the upper extremities; no visual limitations; no communicative limitations; and then, environmentally, I'd say, avoid concentrated extreme cold in the workplace, and avoid concentrated vibration, and avoid concentrated hazards such as hazardous machinery or unprotected heights.

(Tr. 44.)  Dr. Frazin did not identify any additional persistence and pace restrictions based on Plaintiff's pain and other symptoms.  (Tr. 45.)

### 3.  Vocational Expert

The ALJ asked the vocational expert to assume a hypothetical individual with Plaintiff's past relevant work who was "limited to [the] sedentary level of work activity." (Tr. 46.)  Additionally,

> [t]he person would need to be able to change position every hour.  That is to say, after sitting for an hour, the person should be able to stand up for a while, sit back down if necessary.  Only occasional use of foot controls; occasional bending, and stooping, and c[r]ouching.  The person would not be able to work in an environment with extreme concentrated cold, concentrated vibrations; and the person would not be able to work around unprotected heights or dangerous, exposed, moving machinery.

(Tr. 46.)  The vocational expert testified that such an individual would be capable of performing Plaintiff's past relevant work as an account manager—prepress as defined in the Dictionary of Occupational Titles ("DOT"), but not as Plaintiff performed it given the amount of walking that Plaintiff testified had been involved.  (Tr. 47.)

Plaintiff's counsel then asked the vocational expert a number of questions.  (Tr. 47-78.)  In response to counsel's questions, the vocational expert testified that being absent more than two full days per month would rule out competitive employment.  (Tr.

47.)  The vocational expert also testified that if Plaintiff's pain were "to interfere with his attention and concentration frequently during an eight-hour workday," Plaintiff would not be able to perform his past relevant work.  (Tr. 47.)  The vocational expert also testified that Plaintiff would not be able to perform his past relevant work if he "needed to get up and walk around for 15 minutes at a rate of once every 30 minutes."  (Tr. 47-48.)

**B.  ALJ's Decision**

The ALJ found and concluded that Plaintiff had the severe impairments of "lumbar degenerative disc disease status-post micro-discectomy with spinal arthritis" and none of these impairments individually or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17-19.)  The ALJ found that Plaintiff

> had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: able to change position every hour (from sitting to standing and back after an hour); occasional use of foot control[;] occasional bend, stoop, crouch; not work in environment of extreme concentrated cold or vibrations; not work around unprotected heights or dangerous exposed moving machinery.

(Tr. 19.)

In reaching this residual-functional-capacity determination, the ALJ found that the "clinical findings d[id] not fully support [Plaintiff's] subjective allegations" and statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible.  (Tr. 20.)  The ALJ observed that Plaintiff's physical examinations did not "address [his] back but do note that he is overweight."  (Tr. 21.)  The ALJ also observed that "the imaging shows severe stenosis and significant spinal

22

arthritis that can be reasonably expected to cause some pain," which is "reflected in the restriction to sedentary work" and the "sit/stand" option. (Tr. 22.) The ALJ further reasoned that "[t]he clinical findings of left ankle weakness and a reported foot drop also suggest sedentary work and only occasional foot control use." (Tr. 22.) The ALJ "limit[ed Plaintiff's] postural movements noting the imaging studies as well as clinical findings but also note[d] that Dr. Mikhail noted essentially normal range of motion and full hip motion." (Tr. 22.) The ALJ "limit[ed Plaintiff's] exposure to hazards and environmental conditions that may exacerbate his pain." (Tr. 22.)

The ALJ concluded that Plaintiff's treatment was not "consistent with the degree of limitation alleged," noting that Plaintiff had been "only treated by his primary care physician from the application filing date through his presentation to orthopedics in February 2015." (Tr. 22.) The ALJ also noted that Plaintiff reported pain relief from the injections for "up to two months" as well as improvement with physical therapy. (Tr. 22.) The ALJ observed that Plaintiff "was offered surgery, but elected to purse conservative measures," which "suggest[ed] that the pain may not be as limiting as alleged." (Tr. 22.) The ALJ further stated:

> Notably, [Plaintiff] reports pain at a mild to moderate level rather than severe level as was his testimony and he also reported that it reduces as the day progressed. This does not suggest inability to maintain a full time schedule. The treatment records show some adverse medication reactions and lack of effectiveness, but [Plaintiff] does not even use intermittent opioid therapy and he relies essentially on an antidepressant and aspirin, medications not consistent with the degree of limitation alleged.

(Tr. 22.)

The ALJ found Dr. Frazin's opinion "credible and persuasive," and gave it "substantial probative weight." (Tr. 22.) The ALJ noted that Dr. Frazin "is a clinical practitioner with more than twenty years of experience" and "is familiar with the regulations under which disability determinations are made." (Tr. 22.) The ALJ found Dr. Frazin's opinion was "consistent with the weight of the evidence as it is before the Commissioner at the hearing level' and Dr. Frazin was "the only commenting medical professional to review the entire record." (Tr. 22.)

The ALJ gave "some weight" to Dr. Mageli's February 2014 opinion. (Tr. 22-23.) The ALJ "adopted the position changes with respect to a sit/stand option, but . . . note[d] that [Plaintiff] consistently report[ed] that weight bearing exacerbates his pain." (Tr. 23.) In light of Plaintiff's reports of pain with weight-bearing, "findings of ankle weakness," and "reported testimonial limitation in walking," the ALJ concluded that Plaintiff did not require the ability to "walk at will." (Tr. 23.) With respect to Dr. Mageli's opinion that Plaintiff could lift more than ten pounds, the ALJ gave Plaintiff the "benefit of the more limiting sedentary lifting requirements as opined by [Dr. Frazin,] the medical expert." (Tr. 23.) The ALJ "reject[ed] the part time limitations and the projected absenteeism noting that [Plaintiff] present[ed] only intermittently for treatment, has reported benefit from physical therapy and injections and he reports that his symptoms decline as the day progresses." (Tr. 23.) The ALJ determined that "Dr. Mageli offers no explanation as to the rate of absenteeism and the pain reports do not support attention and concentration deficits." (Tr. 23.)

24

With respect to Dr. Mageli's April 2015 opinion, the ALJ rejected this opinion for the same reasons, and further noted that Plaintiff "has no strength deficits except the left ankle" and did "not use an ankle/foot orthosis." (Tr. 23.) With respect to Dr. Mageli's opinion that Plaintiff required a cane, the ALJ noted Plaintiff's "testimony that he uses the cane outside the home and the only intermittent documentation of such use on medical presentation and this is reflected in sedentary work restrictions." (Tr. 23.)

The ALJ found and concluded that Plaintiff was able to perform his past relevant work as an account manager—prepress "as that work is generally performed." (Tr. 23.) The ALJ relied on the vocational expert's testimony that, although this work was "not available to [Plaintiff] as he performed his job," Plaintiff was able to perform this work "as it is performed in the national economy." (Tr. 23.) Accordingly, the ALJ determined that Plaintiff was not under a disability from December 13, 2011 through December 15, 2015, the date last insured. (Tr. 23.)

## VII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the

[ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315(a).  An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

26

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).

Plaintiff's assignments of error are primarily directed at the ALJ's determination of his residual functional capacity at step four, challenging the assessment of his credibility, the purported support for the residual-functional-capacity determination, and the weight accorded to Dr. Mageli, his treating physician.  Plaintiff also asserts that the ALJ failed to give a proper hypothetical to the vocational expert.

### A.  Residual Functional Capacity

Plaintiff's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence.").  Finding and concluding that Plaintiff had the severe impairment of "lumbar degenerative disc disease status-post micro-discectomy with spinal arthritis," the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work with additional limitations.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  Plaintiff further required the ability "to change position every hour (from sitting to standing and back after an hour)"; no more than "occasional use of

27

foot control[s]"; no more than "occasional bend[ing], stoop[ing], [and] crouch[ing]"; and

environments with no extreme cold or vibrations, unprotected heights, and "dangerous

exposed moving machinery." (Tr. 19.)

"Because a claimant's [residual functional capacity] is a medical question, an

ALJ's assessment of it must be supported by some medical evidence of the claimant's

ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). At

the same time, a residual-functional-capacity determination must be "based on all of the

relevant evidence, including the medical records, observations of treating physicians and

others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721

F.3d 521, 527 (8th Cir. 2013) (quotation omitted); *see Perks*, 687 F.3d at 1092 ("Medical

records, physician observations, and the claimant's subjective statements about his

capabilities may be used to support the [residual functional capacity]."). "Even though

the [residual-functional-capacity] assessment draws from medical sources for support, it

is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687

F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c).

## 1. **Plaintiff's Subjective Complaints**

In determining a claimant's residual functional capacity, an ALJ takes into account

subjective complaints, evaluating the credibility of such complaints. *See Perks*, 687 F.3d

at 1092; *see generally Policy Interpretation Ruling Titles II and XVI: Evaluation of*

*Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p, 1996 WL 374186 (Soc. Sec. July 2, 1996) [hereinafter SSR 96-7p].[9]

> When evaluating the claimant's subjective complaints, the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the *Polaski* factors: (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions.

*Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 416.929(c)); *see* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *3. "The ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson*, 600 F.3d at 932 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin*, 826 F.3d at 1086 (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("defer[ring] to an ALJ's credibility finding so long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so" (quotation omitted)).

---

[9] SSR 96-7p was superseded by *Social Security Ruling 16-3p Titles II and XVI: Evaluations of Symptoms in Disability Claims*, 2017 WL 5180304 (Soc. Sec. Oct. 25, 2017) [hereinafter SSR 16-3p]. Plaintiff argues that the ALJ erred in not applying SSR 16-3p. (Pl.'s Mem. in Supp. at 3, 11, 16, ECF No. 12.) As Plaintiff himself acknowledges, SSR 16-3p applies to "determinations and decisions on or after March 28, 2016." 2017 WL 5180304, at *1. The ALJ's decision was rendered on January 29, 2016, before SSR 16-3p went into effect. Therefore, the Court applies SSR 96-7p, which was in effect at the time of the ALJ's decision. *See id.* ("When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review.").

### a. Failure to Recognize Other Severe Impairments

Plaintiff first argues that the ALJ failed to recognize his "severe impairments of lumbar post-laminectomy syndrome, severe lumbar spinal stenosis with neurogenic claudication, lumbar spondylosis and radiculopathy, and left foot drop." (Pl.'s Mem. in Supp. at 12.) Plaintiff argues that "[t]he records consistently reflect [his] complaints of chronic low back pain, radiating into the left-sided buttocks, thigh, and leg." (Pl.'s Mem. in Supp. at 13 (citation omitted).) Plaintiff argues that, by "ignor[ing] these *diagnoses*," the ALJ ignored his "resultant subjective complaints of pain." (Pl.'s Mem. in Supp. at 13 (emphasis added).)

The Commissioner correctly points out that "diagnoses alone do not demonstrate the existence of severe impairments." (Comm'r's Mem. in Supp. at 6, ECF No. 14.) *See Perkins v. Astrue*, 648 F.3d 892, 899-900 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011). Nevertheless, when assessing a claimant's residual functional capacity, the ALJ is required to take into account "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *5 (Soc. Sec. July 2, 1996) [hereinafter SSR 96-8p]; *see* 20 C.F.R. § 404.1545(a)(2) (considering all medically determinable impairments including those that are not "severe"); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (defining residual functional capacity as "the most that [the claimant] was capable of doing despite the combined effects of both her severe and non-severe medically determinable impairments").

30

While Plaintiff argues that the ALJ ignored these diagnoses, the ALJ referenced all but one of them when discussing the medical evidence in the record. (Tr. 20, 21, 22.) The only diagnoses not specifically mentioned by the ALJ was "lumbar spondylosis," which arguably was encompassed by the ALJ's discussion of Plaintiff's other lumbar-related impairments. *See Steadman's Medical Dictionary* 1678 (27th ed. 2000) (spondylosis is "often applied nonspecifically to any lesion of the spine of a degenerative nature"). The thrust of Plaintiff's argument is that, by not concluding that these diagnoses constituted severe impairments, the ALJ ignored Plaintiff's subjective complaints of back pain. But, the ALJ repeatedly referenced Plaintiff's complaints of back pain, including radiating "low back pain" and "back, buttock, and leg" pain, in his discussion of the medical record. (Tr. 21.) While the ALJ did not ultimately find Plaintiff's statements concerning his back pain to be wholly credible, the ALJ clearly considered these back-related impairments and any resultant pain in assessing Plaintiff's residual functional capacity. *See Perkins*, 648 F.3d at 899-900; *see also Lane v. Colvin*, 650 F. App'x 908, 911 (8th Cir. 2016) (per curiam).

### b. *Polaski* Factors

Plaintiff next asserts that "the ALJ fail[ed] to address the impact of [his] subjective complaints of pain on his ability to function." (Pl.'s Mem. in Supp. at 12.) Plaintiff asserts that the ALJ made "no reference to the *Polaski* factors"; did "not address [his[ daily activities and how he has manipulated his daily life to avoid exacerbating his pain"; did "not address [his] difficulties with persistence, pace, and concentration"; and did not discuss treatment measures and their effect on his pain. (Pl.'s Mem. in Supp. at 14.)

Plaintiff also asserts that no weight was given to his "long and successful work history." (Pl.'s Mem. in Supp. at 15.)

Plaintiff is correct that the ALJ did not expressly refer to *Polaski* by name.  Before discussing Plaintiff's subjective complaints, however, the ALJ stated that he was considering Plaintiff's subjective complaints "based on the requirements of 20 CFR 404.1529 and SSR[] . . . 96-7p."  (Tr. 19.)  The ALJ's reference to these authorities and ensuing discussion demonstrate that the ALJ considered Plaintiff's subjective complaints within the proper framework.  *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) ("Although the ALJ never expressly cited *Polaski* (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the *Polaski* factors.").

A claimant's subjective complaints cannot be discounted "solely because the objective medical evidence does not fully support them."  *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014) (quotation omitted); *see* 20 C.F.R. § 404.1529(c)(2); SSR 96-7p, 1996 WL 374186, at *6.  Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," a number of factors are considered along with the medical evidence when assessing credibility.  SSR 96-7p, 1996 WL 374186, at *3.  As stated above, these factors include the claimant's daily activities; the duration, frequency, and intensity of the claimant's pain; things that precipitate and aggravate the claimant's symptoms; treatment, including but not limited to medication, and the effectiveness of such treatment; and functional restrictions.  *See Julin*, 826 F.3d at 1086; 20 C.F.R. § 404.1529(c)(3), (4); SSR

96-7p, 1996 WL 374186, at *3.  And again, caselaw is clear the ALJ is not required to discuss each factor.  *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017); *Halverson*, 600 F.3d at 932; *Moore*, 572 F.3d at 524.  Here, the ALJ found and concluded that the intensity, persistence, and limiting effects of Plaintiff's back pain and other symptoms were not as severe as alleged by considering not only the objective medical evidence, but also Plaintiff's course of treatment and his own statements regarding his pain.

Beginning with the objective medical evidence, the ALJ recounted in detail medical evidence in the record regarding Plaintiff's back pain, including but not limited to the results of the 2015 MRI; clinical findings regarding Plaintiff's gait, range of motion, and motor strength; the presence of some tenderness and "more pain with extension."  (*See* Tr. 20-22.)  The ALJ noted the back surgery in 2012, "imaging show[ing] severe stenosis and significant spinal arthritis," and the left foot drop.  (Tr. 22; *see* Tr. 20-22.)  The ALJ noted medical records showing "some limited range of motion at the lumbar spine and more pain with extension" as well as "involuntary muscle tightness and point tenderness in the lumbosacral region."  (Tr. 21; *see* Tr. 22.)  The ALJ also noted places in the record showing full strength in Plaintiff's lower extremities with the exception of the left ankle; full range of motion in his hips, knees, and ankles; an essentially normal gait; and negative straight-leg raising.  (Tr. 21-22.)  Based on this evidence, the ALJ determined that Plaintiff was limited to sedentary work with additional limitations.  The ALJ reasoned the "severe stenosis and significant spinal arthritis" shown on the MRI could "reasonably be expected to cause some pain and limitation," warranting a "restriction to sedentary work" and a "sit/stand" option.  (Tr. 22.)  The ALJ

also reasoned that "[t]he clinical findings of left ankle weakness and a reported foot drop also suggest sedentary work and only occasional foot control use." (Tr. 22.) The ALJ explained that Plaintiff's postural movements were limited based on "the imaging studies as well as clinical findings," notwithstanding the fact "that Dr. Mikhail noted essentially normal range of motion and full hip motion." (Tr. 22.) And, the ALJ limited Plaintiff's "exposure to hazards and environmental conditions that may exacerbate his pain." (Tr. 22.) Thus, in determining that Plaintiff was capable of performing a limited range of sedentary work, the ALJ recognized that the objective medical evidence provided some support for the presence of Plaintiff's pain and other symptoms.

At the same time, substantial evidence in the record supports the ALJ's determination that Plaintiff's pain and other symptoms were not as intense, persistent, or limiting as Plaintiff alleged based on his course of treatment. *See* 20 C.F.R. § 404.1529(c)(3)(iv), (v), (4); SSR 96-7p, 1996 WL 374186, at *3. First, the ALJ noted that Plaintiff "was only treated by his primary care physician from the application filing date through his presentation to orthopedics in 2015," and these visits were generally focused on complaints other than back pain. (Tr. 21, 22.) Second, the ALJ noted that Plaintiff pursued and generally experienced some relief from conservative treatment measures. Plaintiff reported improvement from the injections administered by Dr. Mageli and physical therapy. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (conservative course of treatment with exercises and medication inconsistent with complaints of disabling pain); *Moore*, 572 F.3d at 524-25 (conservative treatment measures, including injections, limited prescription medication, and over-the-counter

34

medication inconsistent with allegations of disabling pain). The ALJ pointed out that Plaintiff "was offered surgery, but elected to pursue conservative measures," which "suggest[ed] that the pain may not be as limiting as alleged." (Tr. 22.) *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("The ALJ also noted that although Black does experience some limitation, pain, and discomfort, she has never undergone surgery and has relied on a conservative course of treatment, including exercises, home cervical traction, a back brace, and medication." (footnote omitted)). And, while Plaintiff tried a number of prescription medications that either were ineffective or caused allergic reactions, the ALJ properly considered Plaintiff's continued reliance "essentially on an antidepressant and aspirin" for pain management without "even . . . intermittent opioid therapy" as being inconsistent with the degree of pain alleged. *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (claimant's "reliance on aspirin during the relevant time period certainly does not suggest a disabling degree of pain"); *see also Moore*, 572 F.3d at 524-25.

Likewise, the ALJ properly considered Plaintiff's own statements regarding his pain. *See* 20 C.F.R. § 404.1529(a), (c)(3), (4); SSR 96-7p, 1996 WL 374186, at *2. As the ALJ noted, Plaintiff generally reported "pain at a mild to moderate level" to his treatment providers "rather than the severe level" he testified to at the hearing. (Tr. 22.) Plaintiff repeatedly asserts that the record shows his pain rates up to a 10 out of 10. (Pl.'s Mem. in Supp. at 7, 15, 21.) The Court does not doubt that Plaintiff experiences pain.

But, the highest documented pain rating in the record is 5 to 6 out of 10.[10]  (Tr. 373.)
Plaintiff generally rated his pain between 2 and 5 out of 10.  (Tr. 341, 319, 320, 321, 350,
365, 367, 369, 371.)  Accordingly, there is substantial evidence in the record to support
the ALJ's conclusion that Plaintiff generally reported mild to moderate pain.  And, the
ALJ properly took into account Plaintiff's report that his pain "reduce[d] as the day
progressed."  (Tr. 22.)

Plaintiff argues that the ALJ failed to address his "inability to maintain persistence
and pace" due to pain, citing his own testimony that he had difficulty concentrating due
to pain and Dr. Mageli's opinion that his symptoms would frequently interfere with the
attention and concentration needed to perform simple tasks.  (Pl.'s Mem. in Supp. at 13;
see Pl.'s Mem. in Supp. at 15.)  Plaintiff argues that, "[u]sing pure common sense, it is
illogical to conclude that [he] could perform his highly skilled, SVP 8 job, in competitive
employment, on a sustained basis, with severe, distracting pain."  (Pl.'s Mem. in Supp. at
14.)  But, as the Commissioner points out, the ALJ did discuss Plaintiff's alleged
difficulties concentrating due to pain.  (See Comm'r's Mem. in Supp. at 12-13.)  The ALJ
acknowledged these allegations, but determined that Plaintiff's "pain ratings and reports
do not suggest consistent concentration difficulties."  (Tr. 18; see Tr. 20, 23.)  The ALJ
noted that the record contained "no observations by or reports to any provider of
mentation deficits" and "no observable mental status examinations to show limitation."

---

[10] The references in the record to 10 appear to be describing the pain scale itself rather than the degree of pain
Plaintiff was experiencing.  (See, e.g., Tr. 365 ("He rates his pain as 2-3/10 with 10 being the worst possible pain.");
367 ("He rates his pain as 3/10 with 10 being the worst possible pain."); 369 ("He rates his pain as 3-4/10 with 10
being the worst possible pain."); 371 ("He rates his pain as 4/10 with 10 being the worst possible pain."); 373 ("He
rates his pain as 5-6/10 with 10 being the worst possible pain.").

(Tr. 18.)  *See Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (claimant did not complain of problems concentrating to treatment providers).  The ALJ further noted that Plaintiff's "testimony was logical, responsive, and coherent and he did not demonstrate significant difficulties in tracking the hearing."  (Tr. 18.)  And, as discussed above, there is substantial evidence in the record to support the ALJ's determination that Plaintiff's pain allegations were not wholly credible.

Plaintiff also argues that the ALJ failed to address his need to switch between sitting, standing, and walking (emphasizing walking) as well as his need to lie down.  (Tr. 13.)  Plaintiff's argument concerning the need to change positions is essentially directed at the ALJ's weighing of the opinion evidence, which will be discussed below.  In terms of assessing Plaintiff's credibility, however, the ALJ determined that Plaintiff's impairments and resultant pain *warranted* an additional limitation in the form of "a sit/stand option" with the ability to change positions every hour and incorporated this limitation into the residual-functional-capacity determination.  (Tr. 19, 22-23.)  Plaintiff has not pointed to any medical evidence to support his contention that he needs to lie down during the day.  *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("We think whether there is a 'need' to lie down is a medical question that requires medical evidence."); *see also Conklin v. Barnhart*, 206 F. App'x 633, 635 (8th Cir. 2006) (per curiam) (noting the absence of objective medical evidence to support claimant's "need[] to lie down five to six times a day for half an hour to relieve her pain"); *Zeiler*, 384 F.3d at 936 (citing absence of medical evidence to support claimant's "claim that she needs to lie down during the day").

Lastly, Plaintiff argues that the ALJ erred by not discussing his daily activities and work history, both of which he contends weigh in his favor. Plaintiff argues that the ALJ did "not address [his] daily activities and how he has manipulated his daily life to avoid exacerbating his pain," including limiting his activities, performing activities at a slower pace, taking breaks to lie down and using a handicap sticker and cane. (Tr. 14-15.) Additionally, Plaintiff argues that the ALJ did "not give any weight to the fact that [he] has had a long and successful work history." (Tr. 15.) Daily activities and the measures a claimant uses to relieve his pain and other symptoms are factors to be considered when assessing the credibility of subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3)(i), (vi), (4); SSR 96-7p, 1996 WL 374186, at *3. Moreover, a lengthy work history can support complaints of disabling pain. *Black*, 143 F.3d at 387.

The ALJ certainly could have included a detailed discussion of each of these points. Nonetheless, the ALJ did touch on Plaintiff's allegations that he "tires out after 10 to 15 minutes of standing or walking"; needs to lie down repeatedly during the day, including while talking on the phone; and uses a cane outside of his home. (Tr. 20.) In the end, the question is not whether the ALJ mechanically walked through each of the *Polaski* factors. *See Bryant*, 861 F.3d at 782; *Halverson*, 600 F.3d at 932; *Moore*, 572 F.3d at 524. Plaintiff is essentially asking this Court to reweigh his credibility, which "is primarily for the ALJ to decide, not the courts." *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quotation omitted). By acknowledging 20 C.F.R. § 404.1529 and SSR 96-7p and specifically discussing the objective medical evidence, Plaintiff's course of treatment, and Plaintiff's own statements regarding his pain and other symptoms, the

ALJ's analysis demonstrates that Plaintiff's subjective complaints were considered in the proper framework.

In sum, the ALJ provided good reasons for not finding Plaintiff's subjective complaints wholly credible, reasons which are supported by substantial evidence in the record and reflect the considerations of *Polaski*, 20 C.F.R. § 404.1529, and SSR 96-7p. *See Julin*, 826 F.3d at 1086; *Hensley*, 829 F.3d at 934; *see also* SSR 96-7p, 1996 WL 374186, at *4 (requiring specific reasons for credibility determination). Therefore, the Court concludes that the ALJ did not err in assessing the credibility of Plaintiff's subjective complaints.

### 2. Weight Accorded to Medical Opinions

Opinions from acceptable medical sources are statements from physicians about the nature and severity of a claimant's impairments, including any symptoms, diagnosis, and prognosis; what the claimant is still able to do despite the impairments; and any physical or mental restrictions. 20 C.F.R. § 404.1527(a)(1). These opinions are weighed according to a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. *Id.* § 404.1527(c).

In determining whether a claimant is disabled, the ALJ considers the medical opinions along with the other evidence in the record. 20 C.F.R. § 404.1527(b); *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). The ALJ is tasked with resolving conflicts among the various medical opinions and "may reject the conclusions of any medical

expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner*, 499 F.3d at 848 (quotation omitted). Regardless of its source, every medical opinion received is to be evaluated. 20 C.F.R. § 404.1527(c); *Miller v. Colvin*, 784 F.3d 472, 478 (8th Cir. 2015).

### a. Walking

Plaintiff argues that the ALJ erroneously omitted walking from the positional changes, including only a sit/stand option. Drs. Mageli and Frazin both opined that Plaintiff would need to change positions during the day and both referenced walking. In each of his opinions, Dr. Mageli checked "yes" when asked if Plaintiff needed a job where he could "shift positions *at will* from sitting, standing, or walking," and then opined on the amount of time Plaintiff was able to sit and "stand/walk" in an eight-hour day. (Tr. 253, 314.) In his April 2015 opinion, Dr. Mageli additionally opined that Plaintiff needed to walk around approximately every 30 minutes during the day for 15 minutes. (Tr. 314.) Dr. Frazin testified that Plaintiff was able to "stand or walk two hours and sit six hours out of an eight-hour day" and required "the ability to change position every hour." (Tr. 44.)

The ALJ included a sit/stand option in Plaintiff's residual functional capacity—"able to change position every hour (from sitting to standing and back after an hour)." (Tr. 19.) Despite Plaintiff's contention that the ALJ "completely ignore[d]" those portions of Drs. Mageli and Frazin's opinions pertaining to walking, (Pl.'s Mem. in Supp. at 17; *see* Pl.'s Mem. in Supp. at 19-20), the ALJ provided three specific reasons why an option to walk at will was not supported by the record: (1) Plaintiff's "consistent[] reports

40

that weight bearing exacerbates his pain"; (2) "findings of ankle weakness"; and (3) Plaintiff's testimony regarding his ability to walk (tiring out after 10 to 15 minutes of unsupported walking and being able to walk approximately one and one-half blocks at a time). (Tr. 23.)

The citations to the record that Plaintiff provides in support of a need to walk actually demonstrate the ALJ's careful consideration of Drs. Mageli and Frazin's opinions pertaining to walking in light of the record as a whole. (Pl.'s Mem. in Supp. at 20.) While Plaintiff's pain improved with changes in position, Plaintiff consistently reported that walking increased his pain. (Tr. 337 ("[T]he pain is worse when standing and walking. It is relieved by sitting down and lying down."); 341 ("Aggravating factors include standing and walking; while alleviating factors . . . include sitting and lying down on his right side."); 357 ("If lying on side he is ok."); 373 ("He indicates that changes in position will help relieve his pain. He notes that physical activity tends to worsen his pain."); *see also* Tr. 319, 350.) Similarly, Plaintiff testified at the hearing that he had difficulties walking more than short distances or periods of time. The ALJ properly considered the entirety of the record and the inconsistency of those portions of Drs. Mageli and Frazin's opinions pertaining to walking with the record as a whole. 20 C.F.R. § 404.1527(c)(4); *see Wagner*, 499 F.3d at 848. The Court concludes that there is substantial evidence in the record to support the ALJ's decision not to include walking among the positional changes in Plaintiff's residual functional capacity.

### b. Dr. Mageli

Dr. Mageli is an acceptable medical source who treated Plaintiff. *See* 20 C.F.R. § 404.1502(a)(1). Accordingly, as a treating source, his "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin*, 826 F.3d at 1088; *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *see Bernard*, 774 F.3d at 487 ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (quotation omitted)). When a treating source's opinion is not given controlling weight, the opinion is weighed based on the several factors identified above. 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103. Plaintiff argues that the ALJ did not consider the appropriate factors in

assigning weight to the opinions of Dr. Mageli and gave "no *valid* reason as to why Dr. Mageli's opinion [sic] was not given controlling weight." (Pl.'s Mem. in Supp. at 19.)

In his two opinions, Dr. Mageli opined on Plaintiff's abilities to concentrate due to pain and other symptoms, maintain a particular position, and lift and carry. Dr. Mageli opined that Plaintiff's pain and symptoms would frequently interfere with his attention and concentration. Dr. Mageli opined that Plaintiff needed to change positions; could sit and stand for 30 minutes each before needing to change positions; and ultimately could sit and "stand/walk" for less than two hours each in an eight-hour work day. Dr. Mageli further opined that Plaintiff needed a cane for ambulation. Dr. Mageli ultimately opined that Plaintiff was able to lift and/or carry even less than ten pounds. Dr. Mageli opined that Plaintiff would be absent from work more than four days per month and ultimately opined that he was unable to work.

The ALJ gave "some weight" to Dr. Mageli's opinions. As previously discussed, the ALJ "adopted the position changes with respect to a sit/stand option," but rejected the portions of Dr. Mageli's (*and* Dr. Frazin's) opinions pertaining to walking. (Tr. 23.) The ALJ chose the middle road regarding Plaintiff's ability to lift and/or carry, "afford[ing] Plaintiff] the benefit of the more limiting sedentary lifting requirements" opined by Dr. Frazin as compared to Dr. Mageli's February 2014 opinion while rejecting the greater restrictions contained in Dr. Mageli's April 2015 opinion due to the absence of any "strength deficits except the left ankle" in the record. (Tr. 23.) The ALJ rejected the need for a cane as there was "only intermittent documentation of such use on medical presentation" and related pain and symptoms were "reflected in sedentary work

restrictions." (Tr. 23.) The ALJ likewise rejected Dr. Mageli's opinions on Plaintiff's abilities to concentrate due to pain and other symptoms, projected absenteeism, and "part time limitations." (Tr. 23.) The ALJ "noted that [Plaintiff] presents only intermittently for treatment, has reported benefit from physical therapy and injections and he reports that his symptoms decline as the day progresses." (Tr. 23.) The ALJ additionally noted that "Dr. Mageli offers no explanation as to the rate of absenteeism and the pain reports do not support attention and concentration deficits." (Tr. 23.)

Plaintiff argues that "Dr. Mageli's opinions are based on his personal observations and examinations of [Plaintiff] over a period of approximately ten years, taking into account subjective symptoms that the ALJ has simply disregarded." (Pl.'s Mem. in Supp. at 21.) It is true that a treating source like Dr. Mageli is likely to be "most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). But, for the reasons stated above, there is substantial evidence to support the ALJ's determination that Plaintiff's subjective complaints were not wholly credible. Therefore, "[b]ecause the ALJ declined to credit [Plaintiff fully], the ALJ was entitled to discount Dr. [Mageli's] opinions insofar as they relied on [Plaintiff's] subjective complaints." *Julin*, 826 F.3d at 1089.

And, the reasons stated by the ALJ for not giving Dr. Mageli's opinions controlling weight demonstrate that the ALJ considered the factors set forth in 20 C.F.R.

§ 404.1527(c). The ALJ was cognizant of the fact that Dr. Mageli was Plaintiff's primary care physician who had treated Plaintiff for an appreciable period of time. (Tr. 22.) *See* 20 C.F.R. § 404.1527(c)(1), (2) (examining and treating relationships between claimant and source). At the same time, the ALJ properly recognized that certain aspects of Dr. Mageli's opinions were unsupported, such as the absence of any explanation for the projected absenteeism or documented strength deficits other than left-ankle weakness. *See id.* § 404.1527(c)(3) (considering evidence cited in support of or explanation provided for an opinion).

Most significantly, the ALJ observed several places where Dr. Mageli's opinions were inconsistent with the record as a whole. *See id.* § 404.1527(c)(4) (opinion's consistency with the record as a whole). Those portions pertaining to walking were inconsistent with Plaintiff's reports that walking increased his pain and testimony that he had difficulties walking more than short distances or periods of time. The attention and concentration difficulties were inconsistent with the level of pain reported. Documentation regarding Plaintiff's use of a cane was "intermittent." (Tr. 23.) And Plaintiff's reports of some improvement with treatment and a decline in symptoms as the day progressed were inconsistent with Dr. Mageli's overall opinion that Plaintiff's pain was disabling. Plaintiff contends that Dr. Mageli's opinions were "internally consistent." (Pl.'s Mem. in Supp. at 21.) The consistency factor is focused, however, on the opinion's consistency with the record as a whole. 20 C.F.R. § 404.1527(c)(4). An ALJ does not err in assigning less weight to an opinion that is inconsistent with the record as a whole. *See Julin*, 826 F.3d at 1088; *Wagner*, 499 F.3d at 848; *Stormo*, 377 F.3d at 806.

Here, the ALJ properly considered the entire record in determining the weight to be given to Dr. Mageli's opinions and gave good reasons for not giving them controlling weight. The weight assigned to Dr. Mageli's opinions is supported by substantial evidence in the record.

### c. Dr. Frazin

Plaintiff makes two arguments with respect to Dr. Frazin. First, Plaintiff argues that, despite the ALJ's adoption of Dr. Frazin's opinion, the residual-functional-capacity determination was inconsistent with his opinion because "Dr. Frazin's opinion allows for changing positions between sitting, standing, and *walking*." (Pl.'s Mem. in Supp. at 17.) Plaintiff provides no authority in support of his argument that the ALJ was required to either wholesale accept or reject Dr. Frazin's opinion. Moreover, a residual-functional-capacity determination need not be support by a specific medical opinion, just "some medical evidence of the claimant's ability to function in the workplace." *Hensley*, 829 F.3d at 932. As stated above, there is substantial evidence in the record to support the ALJ's decision not to include walking among the positional changes in Plaintiff's residual functional capacity because those portions of Drs. Mageli and Frazin's opinions pertaining to walking were inconsistent with the record as whole.

Second, Plaintiff argues that the residual-functional-capacity determination "is improperly derived solely from Dr. Frazin's medical expert opinion." (Pl.'s Mem. in Supp. at 16.) The opinion of a non-examining physician like Dr. Frazin generally does not constitute substantial evidence in the record as a whole. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Shontos*, 328 F.3d at 427. But, the ALJ did not rely solely on

46

Dr. Frazin's opinion in determining Plaintiff's residual functional capacity. In addition to Dr. Frazin's opinion, the ALJ relied on other medical evidence in the record, including but not limited to the 2015 MRI and clinical findings regarding Plaintiff's strength and range of motion. The ALJ also relied in part on Dr. Mageli's opinions. Along with the medical evidence, the ALJ considered Plaintiff's subjective complaints. Therefore, Dr. Frazin's opinion was just one part of the evidence in the record the ALJ considered in determining Plaintiff's residual functional capacity. *See Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) (ALJ did not rely solely on opinion of non-examining consulting physician, but considered opinion "as one part of the record").

### B. Improper Hypothetical

Plaintiff argues that the ALJ failed to give a proper hypothetical to the vocational expert because the ALJ did not include "Dr. Frazin's and Dr. Mageli's walking requirements" and the "opinions of Dr. Mageli as to [Plaintiff's] limitations." (Pl.'s Mem. in Supp. at 22.) These arguments simply repeat Plaintiff's prior arguments.

The hypothetical posed to the vocational expert "need only include those impairments and limitations found credible by the ALJ." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005); *accord Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." (quotation omitted)). To reiterate, the ALJ properly determined that Plaintiff's subjective complaints were not wholly credible; excluded walking from the positional changes in Plaintiff's residual functional capacity because those portions of Drs. Mageli

and Frazin's opinions pertaining to walking were inconsistent with the record as whole; and discounted Dr. Mageli's opinions. "[T]he hypothetical question to the vocational expert d[oes] not need to incorporate th[ose] additional limitations the ALJ had properly disregarded." *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *accord Perkins*, 648 F.3d at 902 ("[T]he ALJ was not required to include other limitations in the hypothetical that he found to be unsupported in the record."). Therefore, it was not error to omit from the hypothetical walking as a positional change or the additional limitations identified by Dr. Mageli. *See Renstrom*, 680 F.3d at 1067; *Perkins*, 648 F.3d at 902.

Lastly, Plaintiff argues that he is disabled because he is unable to perform his past relevant work. "An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as []he actually performed it *or* as generally required by employers in the national economy." *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007) (emphasis added) (citing *Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990)); *accord Wagner*, 499 F.3d at 853. In response to a hypothetical containing all of the limitations set forth in the ALJ's residual-functional-capacity determination, the vocational expert testified that such a person would not be capable of performing Plaintiff's past relevant work as an account manager—prepress as it was actually performed but would be able to perform this job as it is generally performed. *See* SSR 96-8p, 1996 WL 374184, at *4 ("When it is found that an individual cannot do past relevant work as he or she actually performed it, the adjudicator must consider whether the individual can do the work as it is generally

48

performed in the national economy.").  "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000).  Therefore, notwithstanding the fact that Plaintiff was not capable of performing his past work as it was actually performed, the ALJ properly concluded that Plaintiff was not disabled based on the vocational expert's testimony that a hypothetical individual with Plaintiff's residual functional capacity was capable of performing Plaintiff's past relevant work as it is generally performed.  *See Wagner*, 499 F.3d at 853-54; *Martin*, 901 F.2d at 653.

[Continued on next page.]

## VIII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 13) be **GRANTED**.

Dated: June___12_____, 2018                    _____*s/ Tony N. Leung*_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                for the District of Minnesota


                                                *Michlitsch v. Berryhill*
                                                Case No. 17-cv-3470 (MJD/TNL)


## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).